UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION at LONDON

CIVIL ACTION NO. 03-137-GWU

SHEILA MCKEEHAN,                                                    PLAINTIFF,

VS.                          **MEMORANDUM OPINION**

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,                    DEFENDANT.

**INTRODUCTION**

The plaintiff originally brought <u>McKeehan v. Barnhart</u>, London Civ. Action No.

03-137 (E.D. Ky.) to seek judicial review of an administrative decision denying her

application for Disability Insurance Benefits (DIB) originally filed February 13, 2001.

After a period of administrative reconsideration prompted by the undersigned's

Memorandum Opinion, Order and Judgment of July 30, 2004 (Tr. 218-31), another

negative agency decision was issued (Tr. 196-206).  The appeal is again before the

Court on cross-motions for summary judgment.  For the reasons that follow, the

current agency decision will be affirmed.

**APPLICABLE LAW**

Review of the Commissioner's decision is limited in scope to determining

whether the findings of fact made are supported by substantial evidence.  <u>Jones v.</u>

<u>Secretary of Health and Human Services</u>, 945 F.2d 1365, 1368-1369 (6th Cir.

1991); <u>Crouch v. Secretary of Health and Human Services</u>, 909 F.2d 852, 855 (6th

1

03-137  Sheila McKeehan

Cir. 1990).  This "substantial evidence" is "such evidence as a reasonable mind shall accept as adequate to support a conclusion;" it is based on the record as a whole and must take into account whatever in the record fairly detracts from its weight.  Crouch, 909 F.2d at 855.

The regulations outline a five-step analysis for evaluating disability claims. See 20 C.F.R. § 404.1520.

The step referring to the existence of a "severe" impairment has been held to be a de minimis hurdle in the disability determination process.  Murphy v. Secretary of Health and Human Services, 801 F.2d 182, 185 (6th Cir. 1986).  An impairment can be considered not severe only if it is a "slight abnormality that minimally affects work ability regardless of age, education, and experience." Farris v. Secretary of Health and Human Services, 773 F.2d 85, 90 (6th Cir. 1985). Essentially, the severity requirements may be used to weed out claims that are "totally groundless."  Id., n.1.

Step four refers to the ability to return to one's past relevant category of work, the plaintiff is said to make out a prima facie case by proving that he or she is unable to return to work.  Cf. Lashley v. Secretary of Health and Human Services, 708 F.2d 1048, 1053 (6th Cir. 1983).  Once the case is made, however, if the Commissioner has failed to properly prove that there is work in the national economy which the plaintiff can perform, then an award of benefits may, under

2

03-137  Sheila McKeehan

certain circumstances, be had.  E.g., Faucher v. Secretary of Health and Human Services, 17 F.3d 171 (6th Cir. 1994).  One of the ways for the Commissioner to perform this task is through the use of the medical vocational guidelines which appear at 20 C.F.R. Part 404, Subpart P, Appendix 2 and analyze factors such as residual functional capacity, age, education and work experience.

One of the residual functional capacity levels used in the guidelines, called "light" level work, involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds; a job is listed in this category if it encompasses a great deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls; by definition, a person capable of this level of activity must have the ability to do substantially all these activities.  20 C.F.R. 404.1567(b).  "Sedentary work" is defined as having the capacity to lift no more than ten pounds at a time and occasionally lift or carry small articles and an occasional amount of walking and standing.  20 C.F.R. 404.1567(a), 416.967(a).

However, when a claimant suffers from an impairment "that significantly diminishes his capacity to work, but does not manifest itself as a limitation on strength, for example, where a claimant suffers from a mental illness . . . manipulative restrictions . . . or heightened sensitivity to environmental contaminants . . . rote application of the grid [guidelines] is inappropriate . . ."

3

03-137  Sheila McKeehan

<u>Abbott v. Sullivan</u>, 905 F.2d 918, 926 (6th Cir. 1990).  If this non-exertional impairment is significant, the Commissioner may still use the rules as a framework for decision-making, 20 C.F.R. Part 404, Subpart P, Appendix 2, Rule 200.00(e); however, merely using the term "framework" in the text of the decision is insufficient, if a fair reading of the record reveals that the agency relied entirely on the grid.  <u>Ibid</u>. In such cases, the agency may be required to consult a vocational specialist. <u>Damron v. Secretary</u>, 778 F.2d 279, 282 (6th Cir. 1985).  Even then, substantial evidence to support the Commissioner's decision may be produced through reliance on this expert testimony only if the hypothetical question given to the expert accurately portrays the plaintiff's physical and mental impairments.  <u>Varley v. Secretary of Health and Human Services</u>, 820 F.2d 777 (6th Cir. 1987).

**DISCUSSION**

The court had remanded the case under Sentence Six of 42 U.S.C. § 405(g) for the consideration of new and material evidence, including an MRI report and an indication from the plaintiff's former employer that money earned in the calendar year 2000 was paid out as sick leave, rather than employment.  Since factors relating to both of these items had been used by the ALJ to discount the plaintiff's credibility, additional consideration was in order.

On remand, the ALJ took additional testimony, and considered the new evidence.  He concluded that the plaintiff did have a "severe" impairment due to

4

degenerative disc disease, but was capable of "light" level exertion, with the ability to stand and walk six hours in an eight-hour day, sit two hours in an eight-hour day, and the option of alternating sitting and standing at will.  (Tr. 204).  In addition, she would be subject to non-exertional restrictions of occasional climbing, stooping, bending, crouching, and crawling.  The ALJ also specified that the plaintiff suffered from mild to moderate pain.  (Id.).  He presented a hypothetical question containing these factors to a Vocational Expert (VE), who responded that there were jobs at the light and sedentary level which the plaintiff could perform with these limitations existing in significant numbers in the state and national economies.  (Tr. 356-8).  The ALJ adopted the VE's testimony, and again concluded that the plaintiff was not disabled.  (Tr. 204-6).

On appeal, this court must determine whether the hypothetical factors selected by the ALJ are supported by substantial evidence, and that they fairly depict the plaintiff's condition.

Mrs. McKeehan alleged disability beginning December 24, 1999 due to deteriorating discs in her back, which caused both low back and right leg pain.  (Tr. 85).  She stated that she had been forced to stop her last job in an office at her doctor's insistence because she could not get up and sit down.  (Tr. 35).  She stated that her family physician, Dr. John Michael Watts, would not release her to go back to work.  (Id.).  After physical therapy was unsuccessful, she had been referred to

a neurosurgeon, Dr. William Brooks, who told her that she had degenerative discs, but surgery was not an option and she could only take pain medications. (Tr. 36, 354). Dr. Brooks had referred her to a pain specialist, who had performed some injections, but these caused indentations in her back and she also found it difficult to drive from Corbin to Lexington. (Tr. 40, 355).

Medical records in the transcript include a letter from Dr. Brooks to Dr. Watts dated October 28, 1999. Mrs. McKeehan reported a long history of back problems, which had worsened recently as she had been taking care of a newborn child. (Tr. 273). The lower back pain radiated into the right hip and leg "in a somewhat ill-defined, non-dermatomal distribution." Her neurological examination showed a restriction in range of motion, but otherwise was normal. Dr. Brooks prescribed pain medication, and ordered a new MRI. (Id.). The MRI is dated November 4, 1999. The radiologist interpreted it as showing degenerative disc disease at L4-L5 and L5-S1 with no focal disc herniation. (Tr. 286). There was a "mild" disc bulge slightly flattening the thecal sac at L4-L5 and a smaller disc bulge at L5-S1 which "minimally" indented the thecal sac, but there was no foraminal stenosis or nerve root entrapment. (Id.).

Dr. Watts noted on December 27, 1999, a few days after the plaintiff's alleged onset date, that she was not working and "now wants off work." (Tr. 146). He found tenderness and a reduced lumbosacral spine range of motion. He agreed

that he would take Mrs. McKeehan off work for a month.  (Id.).  After her physical examination was unchanged over several more visits, Dr. Watts informed his patient on March 14, 2000 that she needed to stop her job.  (Tr. 144).  As her condition was largely unchanged in August, 2000, he advised her to apply for disability and noted that he did not feel that she would be able to return to work.  (Tr. 142).  On October 3, 2000, he discussed a disability form with the plaintiff and noted that she was unable to sit, stand, and walk "in a work environment" but could do it at home when she had plenty of rest and relief.  (Tr. 141).  He concluded that she was unable to hold down any form of work with any regularity.  (Id.).

After continued complaints of pain in 2002, including reporting that she could not sleep well due to pain, Mrs. McKeehan was referred to Dr. William Lester, an orthopedist.  (Tr. 257-8).  Dr. Lester's examination showed lumbosacral and sacroiliac joint tenderness, with negative straight leg-raising and normal reflexes and motor strength.  (Tr. 281).  He prescribed three weeks of physical therapy and home exercises and indicated that it would take a month for the plaintiff to get better.  (Id.).  On follow-up, the plaintiff complained of more pain in her right leg and knee, but the examination was unchanged.  (Tr. 282).  Mrs. McKeehan apparently did not follow up with Dr. Lester.  (Tr. 341).  She reported to Dr. Watts in January, 2003 that she did not feel the physical therapy had helped her and she was not able to do anything without pain.  (Tr. 259).  Essentially, her treatment with Dr. Watts

7

continued unchanged, with the physician's sparse notes showing very little in the way of physical findings.

In October, 2004, Mrs. McKeehan was seen again by Dr. Brooks. She stated that she had continued to worsen since her last visits in 1999. (Tr. 275). Dr. Brooks found a limitation in range of motion, but all of his other testing was negative, with no weakness, sensory loss, or reflex abnormalities. He ordered another MRI, which showed a very mild scoliotic curvature and disc space narrowing at L4-L5 and L5-S1, consistent with degenerative disc changes. (Tr. 287). There was no spinal stenosis or focal disc herniation. On follow-up, Dr. Brooks noted these results and continued to find that Mrs. McKeehan's condition did not lend itself to surgical intervention. (Tr. 277). He stated that he believed her problem was permanent and "unfortunately progressive" and referred her to a pain management physician, along with suggesting a functional capacity evaluation. (Id.). At the plaintiff's request, Dr. Brooks wrote a letter on March 1, 2005 addressing the differences between the 1999 and 2004 MRIs. He stated that there was no spinal stenosis or disc herniation but "[a]s one would anticipate, there has been progression in the degenerative nature of the intervertebral discs." (Tr. 344).

Finally, there is one office note from a pain management specialist, Dr. R. Ramezankhani, dated November 29, 2004. (Tr. 278). He reviewed the November, 2004 MRI and agreed that it was consistent with degenerative disc disease. (Id.).

On examination, the plaintiff was using a cane to ambulate and had an antalgic gait. He noted tenderness on examination at several points, including a "severely" tender right sacroiliac joint and sensation decreased in the right L5-S1 dermatome.  (Tr. 279-80).  He believed that the plaintiff did have moderately severe pain and prescribed injections and home exercises with a "guarded to maybe good" prognosis.  (Tr. 280).  The plaintiff stated, however, that she had decided to postpone the injections.  (Tr. 355).

Dr. Watts provided a functional capacity form dated February 17, 2005, stating that Mrs. McKeehan could occasionally lift ten pounds, could not perform any sitting, standing, or walking, could not use her feet for any repetitive movements such as operating foot controls, and had a total restriction on activities involving unprotected heights, moving machinery, marked changes in temperature and humidity, driving automobile equipment, and exposure to dust, fumes, and gases. (Tr. 336).

The ALJ rejected the opinions given by Dr. Watts, citing the lack of significant clinical and laboratory abnormalities in his reports which one would expect in a disabled person, and additionally opined that Dr. Watts appeared to be relying on the plaintiff's subjective reports of symptoms.  (Tr. 203).  He also raised the possibility that Dr. Watts might be sympathizing with the plaintiff, or that he had

9

03-137  Sheila McKeehan

provided the restrictions in an attempt to avoid tension with his patient.  (Id.).[1]  In

any case, he rejected the treating physician's opinion and accorded weight to state

agency physicians who had reviewed the record in April and August of 2001.  (Tr.

148-55, 173-80).

The plaintiff asserts on appeal that the ALJ's rationale was faulty in rejecting

the treating physician opinion, and correctly notes that the opinions of the agency

reviewers were not based on their review of the complete case record.

While it is normally the case that, due to the substantial deference owed to

a treating physician opinion, the opinion of a non-examining source can be relied

on only if the non-examiner has had a complete review of the evidence, see Barker

v. Shalala, 40 F.3d 789, 794 (6th Cir. 1994); Social Security Ruling (SSR) 96-6p, the

court believes that this is an unusual instance of a treating physician opinion being

so patently deficient that the ALJ could not possibly credit it.  The most recent

functional capacity assessment of Dr. Watts is simply incredible in that it limits the

plaintiff to no sitting, standing, or walking.  (Tr. 336).  Mrs. McKeehan is clearly not

bedridden, in view of her testimony and statements to physicians that she did some

_____

[1]The court agrees with the plaintiff that this was not a persuasive ground on which
to question Dr. Watts's restrictions, in view of the lack of evidence for it.  However, the
other grounds cited by the ALJ were sufficient.

10

03-137  Sheila McKeehan

housework and occasionally drove to the bank or to the store.  (Tr. 36-8, 278).[2]
Controlling weight need not be given to the opinion of a treating physician where he
has been contradicted by the plaintiff.  <u>Warner v. Commissioner of Social Security</u>,
375 F.3d 387, 390 (6th Cir. 2004).  The earlier opinions given by Dr. Watts in his
office notes were partially vocational conclusions outside his area of expertise, and
his assertion in October, 2000 that she was unable to sit, stand, and walk "in a work
environment" but could do so at home is also baffling.  Moreover, his office notes
frequently indicate that, despite the alleged restriction, she was able to sit, stand,
and walk "okay" or "well."  (Tr. 140-1, 143, 257, 265, 270).  Essentially, the office
notes as a whole are negative for any physical findings other than tenderness.
None of the three examining specialists listed any functional restrictions, with Dr.
Lester appearing to indicate that he felt her condition would get better in only a
month.   The lumbar MRI scans confirmed the presence of non-operable
degenerative changes, and while, as the plaintiff notes, the fact that surgery would
not be helpful does not positively indicate that the plaintiff was capable of working,
the MRIs do not suggest the presence of a condition consistent with an inability to

---

[2]Nor is it clear why the physician would have applied total restrictions on changes
in temperature and humidity and exposure to dust, fumes, and gases, particularly in view
of the fact that the plaintiff smoked.  (E.g., Tr. 279).  The Sixth Circuit court has noted
that it is difficult to envision a severe environmental restriction for a plaintiff who smokes
cigarettes.  <u>Sias v. Secretary of Health and Human Services</u>, 861 F.2d 475, 480 (6th Cir.
1988).

03-137  Sheila McKeehan

perform even sedentary activities, either.  A state agency reviewer, Dr. J. E. Ross, commenting on the evidence in 2001, essentially made these same points, i.e., few objective findings, and the fact that the plaintiff could sit and stand "okay." (Tr. 155). Therefore, the court finds that this is a case in which a remand for additional development would be "an idle and useless formality."  NLRB v. Wyman-Gordon, 394 U.S. 759, 766 n. 6 (1969), cited in Wilson v. Commissioner of Social Security, 378 F.3d 541,546 (6th Cir. 2004).

The decision will be affirmed.

This the 17th day of June, 2009.

**Signed By:**

**G. Wix Unthank**

**United States Senior Judge**

12